Edwin P. KIRKPATRICK and Thomas J. Cuni, Appellants,

v.

Carlos LAWRENCE, Randolph A. Kingsley, Geraldine Lawrence, and C & J Containers, Inc., Appellees.

No. 93–CA–2535–MR.

Court of Appeals of Kentucky.

Oct. 6, 1995.

Frederick V. Short, Burlington, for appellants.

John A. Berger, Florence, for appellees.

Before COMBS, DYCHE and SCHRODER, JJ.

COMBS, Judge.

Edwin P. Kirkpatrick and Thomas J. Cuni appeal from the Boone Circuit Court's judgment in favor of the Appellees. The judgment dismissed an action by Kirkpatrick and Cuni to recover a commission allegedly owed to them for the sale of Appellee Carlos Lawrence's business. The focus of our review is the trial court's conclusion that the seller of a business is not liable for a commission to an unlicensed broker where the commission contract contemplated that the unlicensed broker would arrange for the sale of real estate and other business assets in violation of the provisions of KRS Chapter 324. After carefully reviewing the record and the applicable law, this Court affirms.

### FACTS

In 1991, Carlos Lawrence decided to sell his Northern Kentucky business, C & J Enterprises. Lawrence was contacted by Barbara Conley, who induced Lawrence to sign an exclusive listing contract with her agency, Coletta & Associates of Cincinnati, Ohio.[1] After the listing contract had been signed, Conley introduced Lawrence to Appellant Thomas Cuni.[2] Cuni does not have, nor did he have at that time, an active real estate license. He describes himself as a "financial service consultant."

In June of 1991, Cuni talked with his colleague, Appellant Kirkpatrick, about Lawrence's business. On July 2, 1991, Kirkpatrick traveled from his home in Virginia to Kentucky in order to tour the facilities of C & J Enterprises.[3] Kirkpatrick does not, nor did he have at that time a real estate license. He describes himself as a "corporate finance consultant."

By facsimile transmission, on July 19, 1991, Kirkpatrick sent a letter that originat-

---

1. This listing contract ran through March 11, 1991 and provided for a 10% commission on an asking price for the business of $9.9 million dollars.

2. There is some evidence of record to indicate that Cuni was initially represented as being a licensed real estate broker.

3. There is some evidence of record to suggest that Kirkpatrick was represented, at that time, as being a prospective purchaser of the business.

ed in Virginia to Cuni at the Signature Inn in Florence, Kentucky. Kirkpatrick had arranged for Cuni to hand-deliver the letter to Lawrence's office. The letter was post-dated July 22, 1991 and had been printed on what appeared to be C & J Enterprises letterhead that had been created by Kirkpatrick. It purported to be a letter *from Lawrence* addressed to Kirkpatrick setting forth contract terms for a 5% commission payable to Kirkpatrick upon the sale of C & J Enterprises.[4] Lawrence did not sign the contract but took it to his attorney for review. Lawrence's attorney advised against signing the purported commission contract and began to negotiate with Kirkpatrick for an acceptable commission agreement. On August 6, 1991, Lawrence's attorney wrote to Kirkpatrick detailing the terms of a contract to which his client would agree. Kirkpatrick rejected the attorney's proposals.

Based on the stalled negotiations, Kirkpatrick concluded that Lawrence's lawyer was failing to serve his client's best interests. He decided to sidestep the attorney and to contact Lawrence directly. Kirkpatrick advised Lawrence by telephone that unless a more favorable arrangement was reached there could be no deal with a prospective buyer that he had already located. Kirkpatrick again forwarded a proposed commission agreement to Cuni with directions to take it directly to Lawrence at his plant in Hebron, Kentucky. The alleged commission contract was a letter dated August 13, 1991. Again, Kirkpatrick had printed the agreement on what appeared to be C & J Enterprises letterhead. It purported to be a letter addressed to Kirkpatrick *from Lawrence,* providing for a 4% commission upon the sale of C & J Enterprises or its assets to any buyer referred by Kirkpatrick. Without consulting his attorney, Lawrence signed the agreement and returned it to Kirkpatrick who subsequently backdated it. Meanwhile, in a separate agreement, Kirkpatrick and Cuni agreed to divide any commission earned on a 65/35

basis in direct violation of KRS 324.020(3), which prohibits such a fee splitting arrangement.

Kirkpatrick made contact with Appellee Randolph Kingsley, of Gross Pointe, Michigan, who requested a tour of the subject facilities. Kingsley met with Lawrence and Cuni at C & J Enterprises on February 17, 1992.

On April 15, 1992, Lawrence and his wife, Appellee Geraldine Lawrence, sold the business assets to C & J Containers Corp., an Ohio corporation formed by Kingsley and other investors. The agreement between Lawrence and C & J Containers Corp., provided for a purchase price of $1,200,000.00 with an additional $300,000.00 paid as consideration for a covenant not to compete. The transaction included a lease for the real property used in the operation of the business. On April 20, 1992, Kirkpatrick forwarded a letter to Lawrence asking him to remit $60,000.00 for services rendered. When Lawrence refused to pay, Kirkpatrick and Cuni filed suit for breach of contract. After hearing the evidence and reviewing the applicable law, the trial court concluded that the purported commission contract was void and unenforceable. The suit was dismissed.

On appeal, Kirkpatrick and Cuni allege that the trial court erred in concluding that their claims for compensation were barred by Kentucky's real estate brokers licensing act. They contend that their activities did not fall within the ambit of conduct prohibited by the act and that they are entitled to recover a commission on that part of the transaction pertaining solely to the sale of tangible and intangible personal property. We disagree.

 Kentucky's real estate brokers licensing statutes were enacted to protect the public from unscrupulous and incompetent brokers. *Ledford v. Faulkner,* Ky., 661 S.W.2d 475 (1983).[5] The act requires persons dealing in real estate to obtain a real

---

4. This "innovative" approach to contract negotiation apparently represented an attempt by Kirkpatrick to control the place at which the contract was considered to have been made and thereby to determine applicable law by essentially creating a conflict of laws issue in a suit for his compensation.

5. Kentucky, like most other states, has not elected to enact separate provisions aimed at regulating "business brokers."

estate brokers license. At the time of the execution of the commission contract, KRS 324.020 provided that:

> (1) It shall be unlawful for any person to act as a broker or real estate sales associate or to advertise or assume to act as such broker or sales associate within the Commonwealth of Kentucky, without a license issued by the Kentucky real estate commission.

The term "broker" was defined as,

> [A]ny person who for a fee, commission, compensation or other valuable consideration sells or offers for sale, buys or offers to buy, or otherwise deals in time sharing options, or negotiates the purchase or sale or exchange of real estate, or engages in property management, or who leases or offers to lease, or rents or offers for rent, or refers or offers to refer for the purpose of securing prospects, any real estate or the improvements thereon for others. . . .

KRS 324.010(a). The term "real estate" was also defined broadly to include leaseholds and other interests less than leaseholds. KRS 324.010(d).

Again, the central issue presented by this appeal is whether an unlicensed business broker can recover a commission on the sale of a business when the transaction includes the transfer of an interest in real property. This issue was first presented for our consideration in *Lockridge v. Hale*, Ky.App., 764 S.W.2d 84 (1989). There, the plaintiff, an unlicensed business broker, sued for the enforcement of a commission contract after he had successfully located a purchaser for a working horse farm. The Court refused to enforce the commission agreement.

In considering the issue, the Court adopted a bright-line rule that a commission contract involving the sale of real estate "is unenforceable regardless of whether the parties' intent was to include personalty in the computation of a commission." *Id.* at 86. The approaches of other jurisdictions were reviewed at length, and the Court ultimately concluded that "it is generally held that a person who negotiates [the sale of an ongoing

business], which includes real estate, must be licensed as a broker to be entitled to *any* commission on the sale." *Id.* at 87.

Kirkpatrick and Cuni admit that they are unlicensed. They emphasize, however, that the commission and sales contracts involved in *Lockridge* differed significantly from those at issue here and that their involvement in the ultimate sales transaction was only minimal. We do not believe that those differences remove this transaction from the real estate brokers licensing statutes or alter the application of the *Lockridge* rule. In an elaborate attempt to distinguish the holding of *Lockridge*, Kirkpatrick and Cuni present us with three arguments.

First, they contend that the commission contract at issue here concerned the sale of the business as a going concern and not the sale of real estate while the contract at issue in *Lockridge*, the sale of a horse farm, necessarily envisioned the transfer of real property.

A close review of the record belies the assertion that Kirkpatrick's commission contract did not contemplate the transfer of an interest in real property. The commission agreement specifically provided that Kirkpatrick would refer "suitable parties who may be willing to undertake the *purchase of assets* and/or operations of C & J." Both Kirkpatrick and Cuni were well aware that the assets of C & J Enterprises included valuable real property interests. In advertising the business for sale, Kirkpatrick specifically referred to the "two acre facility" and discussed the leases in effect at the Ohio location. As a selling point, he highlighted the fact that the business was located on property near the airport.[6] That the ultimate transaction was clearly contemplated to include the transfer of real property is further borne out in a letter from Kirkpatrick to Cuni. Kirkpatrick wrote that, "the terms for purchase of C & J at $1.7, incorporating *a lease of plant facilities*, appears quite attractive." Finally, in a narrative prepared by Kirkpatrick in advance of litigation, he noted

---

6. Significantly, a FAA certificate associated with the business that Kirkpatrick and Cuni admit was "primary" to the transaction apparently could be transferred quickly only if the business remained located at its current address.

that "Mr. Lawrence informed me ... that he was willing to sell C & J, which included the plant facility and two acres of ground at Hebron...." The evidence is clear that the sale of the business at a highly advantageous location—the acreage at Hebron, as well as the property in Ohio—was specifically contemplated. We reject the assertion that *Lockridge, supra,* and Kentucky's real estate brokers licensing act are inapplicable on this basis.

This first argument contains a second part or alternative sequel whereby Kirkpatrick and Cuni would distinguish away the precedent of *Lockridge* because the plaintiff there claimed to be entitled to recover a commission based on the value of the *entire* transaction—including the value of the real property ultimately transferred to the purchaser. Kirkpatrick and Cuni, on the other hand, seek to recover a commission based only on that part of the transaction relating to the sale of the personalty. They urge this Court to abandon the rule of *Lockridge, supra,* in favor of a more flexible approach employed by a number of other jurisdictions. We decline to do so.

Second, Kirkpatrick and Cuni next argue that unlike the broker in *Lockridge,* their involvement with the transaction was minimal. They contend that negotiations to close the deal involved only the principals and not either of them. They seem to draw a distinction between a "finder" and a "broker," indicating that one serving as a mere "finder" should be exempted from the brokers licensing act. We rely on the reasoning of a Pennsylvania court in *Harrison v. Soffer,* 221 Pa.Super. 275, 289 A.2d 752 (1972), to reject this distinction:

> We cannot give to the word "negotiate", in the sense intended by the Legislature, the strict construction contended for by appellee. If we should so do, it would exclude from the regulatory purpose of the Act a great percentage of brokers and salesmen who normally do no more than acquaint prospective buyers and sellers with the location and price of available property....

*quoting Verona v. Schenley Farms Co.,* 312 Pa. 57, 167 A. 317 (1933). This sound logic reinforces the statutory intent in Kentucky as well.

Third, Kirkpatrick and Cuni argue that *Lockridge* is inapposite because the ultimate transaction between Lawrence and C & J Containers, Inc., did not involve the sale of real property and that the lease agreement between the two principals was not included in the asset purchase agreement. These contentions are specious.

The ultimate transaction between Lawrence and C & J Containers, Inc., did not have to include the *sale* of real property in order to be governed by Kentucky's real estate brokers licensing act. As we have noted above, the act defines the term "real estate" specifically to include leaseholds. The lease of the real property associated with the business was an essential element of the transaction and as such was specifically discussed both in Kingsley's letter of intent and in the parties' asset purchase agreement. We do not agree that the lease provisions of the ultimate transaction were so insignificant as to remove this transaction from the broad purview of the real estate brokers licensing act.

Kentucky has indisputably adopted a rigid rule precluding enforcement of commission contracts procured by unlicensed brokers. The policies and views of other jurisdictions were carefully considered and specifically rejected by the *Lockridge* Court. After reviewing anew the opinions of other jurisdictions, we are not persuaded by arguments to require trial courts to determine: (1) whether the real property portions and personal property portions of a commissions contract are severable (*Kazmer–Standish Consultants v. Schoeffel Instruments Corp.,* 89 N.J. 286, 445 A.2d 1149 (1982)); (2) whether the value of each portion is readily ascertainable (*See Turnpike Motors, Inc. v. Newbury Group, Inc.,* 403 Mass. 291, 528 N.E.2d 1176 (1988)); or (3) whether one portion is "merely incidental" to the other (*See Weingast v. Rialto Pastry Shop,* 243 N.Y. 113, 152 N.E. 693 (1926)).

Our legislature deliberately set forth exceptions to Kentucky's licensure require-

ments.[7] It could have enacted a statute providing that, in circumstances like these, a broker would be entitled to a reduced commission, one reflecting *pro rata* only the value of the personal property. It simply did not choose to do so, and we refrain from so legislating by judicial construction or fiat.

 In a separate argument, Kirkpatrick and Cuni contend that their activities were not regulated by Kentucky's licensure provisions because our legislature did not intend to regulate conduct occurring outside Kentucky. We cannot determine where or whether this issue was preserved for appellate review as it does not appear that this argument was ever made to the trial court. Kirkpatrick and Cuni never presented a jurisdictional argument as to the conflict of law issue that they apparently went to some trouble to concoct. Appellants cannot switch horses between the trial court and this Court. *Kennedy v. Commonwealth*, Ky., 544 S.W.2d 219, 222 (1976). Regardless of the failure to present or preserve the conflicts argument, the bare allegation of conflicting forums fails since it is clear that both Kirkpatrick and Cuni acted within the Commonwealth's borders. In fact, their complaint provides that the commission contract "was entered into partially in the Commonwealth of Kentucky ... and was to be performed in the Commonwealth of Kentucky."

Additionally, Kirkpatrick's attempt to shield himself in some manner by delivering the contract, via facsimile, to Cuni in Kentucky, who then hand-delivered the contract to Lawrence, is inconclusive. It is clear that the two brokers were working as partners on the deal rendering the actions of one imputable to the other.

Finally, Kirkpatrick and Cuni contend that even if they did violate Kentucky's real estate brokers licensing act, the trial court's refusal to enforce the commission contract is not an appropriate remedy. We disagree. Such refusal is the only remedy capable of preserving the purpose of our legislature in enacting this protective legislation.

7. For instance, the legislature saw fit to except specifically those brokers "whose only compensation for negotiating the purchase, sale or lease of an interest or interests in mineral rights con-

For the foregoing reasons, the judgment of the Boone Circuit Court is affirmed.

All concur.

sists of an interest in the rights that are the subject of the purchase, sale, or lease. ..." KRS 324.010.