RENDERED: FEBRUARY 23, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0340-MR

DR. JOHN D. RHODES III;
FINCASTLE GROUP, LLC; AND
RHODES FAMILY LIMITED
PARTNERSHIP                                                    APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
ACTION NO. 15-CI-005248


GEORGE T. UNDERHILL &
ASSOCIATES, LLC, D/B/A
UNDERHILL ASSOCIATES AND
GEORGE T. UNDERHILL, III                                      APPELLEES

AND


NO. 2022-CA-0342-MR

GEORGE T. UNDERHILL &
ASSOCIATES, LLC, D/B/A
UNDERHILL ASSOCIATES AND
GEORGE T. UNDERHILL, III                          CROSS-APPELLANTS


CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
ACTION NO. 15-CI-005248

DR. JOHN D. RHODES III;
FINCASTLE GROUP, LLC; AND
RHODES FAMILY LIMITED
PARTNERSHIP                                              CROSS-APPELLEES


OPINION
AFFIRMING APPEAL NO. 2022-CA-0340-MR
AND
AFFIRMING CROSS-APPEAL NO. 2022-CA-0342-MR

** ** ** ** **

BEFORE:  ACREE, KAREM, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Dr. John D. Rhodes III, Fincastle Group, LLC, (Fincastle)

and Rhodes Family Limited Partnership (Rhodes Partnership) bring Appeal No.

2022-CA-0340-MR from a January 20, 2021, Findings of Fact, Conclusions of

Law, and Judgment which became final and appealable upon entry of a February

25, 2022, Memorandum and Order of the Jefferson Circuit Court.  George T.

Underhill & Associates, LLC, d/b/a Underhill Associates, and George T.

Underhill, III, bring Cross-Appeal No. 2022-CA-0342-MR from the same

judgment and order.  We affirm both Appeal No. 2022-CA-0340-MR and Cross-

Appeal No. 2022-CA-0342-MR.

These appeals stem from complex business dealings between the

parties spanning some twenty years and involving several real estate ventures.  Due

to the complexity of the underlying facts, we will only recite those facts necessary to our disposition of the two appeals.

George T. Underhill, III, is an attorney, certified public accountant, and real estate broker. Dr. John D. Rhodes, III, is a retired cardiologist. Underhill and Rhodes started doing business together in the 1990's and were involved in several real estate projects throughout the years, including what became known as the Glenview Property. The Glenview Property is located in Jefferson County and was originally owned by Alexis Borden and David Borden. The Bordens sought to sell the Glenview Property and agreed that a personal friend, James Ruch, would assist them in locating a buyer. As compensation, the Bordens and Ruch agreed that Ruch would receive a percentage of the sale of the Glenview Property, even though Ruch was not licensed to sell real estate in Kentucky. Underhill was a personal friend of Ruch and was aware that Rhodes and Fincastle were interested in purchasing real property to build residential subdivisions. Their efforts proved successful, and Glenview Property was ultimately sold to Rhodes and Fincastle.

Before the sale, Rhodes and Fincastle entered into a September 25, 2007, Commission Agreement with Underhill Associates. Therein, Rhodes and Fincastle agreed to pay Underhill Associates a commission of 2.9 percent as the "Broker." The 2.9 percent was to be paid upon the sale of each lot within the subdivision to a third party. Two days later, on September 27, 2007, Underhill and

Ruch executed an agreement (September 27, 2007, Fee Splitting Agreement), wherein it was agreed that Ruch would receive 75 percent of the commission payable to Underhill Associates from Rhodes and Fincastle. Eventually, the residential subdivision lots were sold to third parties. Rhodes and Fincastle refused to pay the 2.9 percent commission per the September 25, 2007, Commission Agreement.

Ultimately, on October 14, 2015, November 25, 2015, and February 26, 2018, Underhill, Underhill Associates, and Underhill on behalf of TR of Montgomeryville, Inc. filed complaints and petitions for declaratory relief against, *inter alios*, Rhodes, Fincastle, and the Rhodes Partnership. In relevant part, it was alleged:

> 29. On September 25, 2007, Rhodes and Fincastle, collectively, as the "Developer," entered into the Agreement with Underhill Associates as "Broker" attached hereto as **Exhibit 2** (the "Glenview Park Agreement").
>
> 30. Under a certain Contract of Purchase and Sale, Rhodes/Fincastle acquired real property (the "Property") for the purposes of developing it into the subdivision that became known as Glenview Park. Pursuant to the Glenview Park Agreement, Underhill Associates agreed to defer its commission earned for its role in procuring and negotiating the Contract of Purchase and Sale.
>
> 31. In exchange for Underhill Associates' agreement to defer its commission, Rhodes/Fincastle agreed to pay Underhill Associates a 2.9% commission

on the sale of any residential subdivision Lot developed on the Property.

32.    Between May 31, 2012[,] and September 29, 2015, twenty-two lots eligible for commissions under the Glenview Park Agreement were sold for a total of $5,779,750.00.

33.    Rhodes/Fincastle have failed and refused to pay Underhill Associates $122,090.00 in earned commissions on these Lot sales.

34.    Twenty-eight additional sales are anticipated, and Rhodes/Fincastle have likewise manifested a refusal to pay Underhill Associates' 2.9% commission on these anticipated future sales.

. . . .

38.    On or about November 11, 2009, Underhill as "Borrower" and Rhodes Family L.P. as "Lender" entered into a Promissory Note in the principal amount of $594,454.00, attached hereto as **Exhibit 4**.

39.    The Promissory Note was structured as a demand note bearing 7% interest per annum on the unpaid principal balance.  Under the terms of the Promissory Note, Underhill was to make principal payments of $3,467.65 for a period of two years commencing December 10, 2009.

40.    No later than January 15, 2012, Rhodes and Underhill agreed that the principal balance of the Promissory Note had been reduced to $452,454.00, after accounting for, *inter alia*, the performance fees . . . . Rather than paying the entire performance fees to Underhill in cash, Rhodes and Underhill had agreed that $142,000.00 of the fees would be credited against the principal balance of the Promissory Note.

41.     During the succeeding three-and-a-half years, the principal balance of the Promissory Note was reduced by payments and credits totaling approximately $208,000.00.

42.     On or about June 11, 2015, Rhodes Family, L.P. made demand upon Underhill for $956,633.78, purporting to be the total amount of unpaid principal and interest due under the Promissory Note.  On or about June 12, 2015, Rhodes Family, L.P. revised the demand downward to $890,244.54.

43.     The payoff amount was apparently calculated under the assumptions that the Promissory Note was in default from inception; that both principal <u>and</u> interest payments were due from inception; and that penalty interest and late fees had been accruing since inception.  These assumptions are all erroneous and contradict the terms of the Promissory Note.  The erroneous assumptions made by Rhodes Family L.P. serve to artificially inflate the amount due under the Promissory Note.

44.     The stated payoff amount was also inflated by Rhodes Family L.P.'s failure, *inter alia*, to acknowledge the $142,000.00 credits due to Underhill for the aforementioned performance fees he had earned.

45.     Prior to June 2015, Rhodes Family L.P. had not made any demand for payment of the Promissory Note nor alleged the existence of any event of default.

46.     The actions of Rhodes Family L.P. have made it impossible for Underhill to perform his obligations under the Promissory Note because, even were Rhodes Family L.P. to receive payment of the actual amount owed, Rhodes Family L.P. would persist in alleging that the Promissory Note is in default based on the artificially inflated payoff amount.  Underhill is entitled to a declaration of the accurate payoff amount

-6-

which, *inter alia*, includes the $142,000.00 credits presently disputed by Rhodes Family L.P., as well as any other payments and credits which have not been applied through the present time.

November 25, 2015, First Amended Complaint at 7-10. In response, Rhodes, Fincastle, and Rhodes Partnership filed a document styled "Counterclaims, Answer and Defenses." In the answer, Rhodes, Fincastle, and Rhodes Partnership admitted that certain lots were sold in the Glenview Park Subdivision and admitted that "they have not paid Underhill Associates commissions that Underhill Associates claims to be owed." December 23, 2015, Rhodes Counterclaims, Answer and Defenses at 18. For their counterclaims, Rhodes, Fincastle, and Rhodes Partnership alleged that Underhill defaulted under the terms of a November 10, 2009, Promissory Note (2009 Promissory Note):

> 34. On November 10, 2009, Underhill executed and delivered to the Rhodes Family LP that certain promissory note in the original principal amount of $594,454.00 (the "Promissory Note"). Underhill, a current or former practicing attorney in Kentucky, drafted the Promissory Note. A true and correct copy of the Promissory Note is attached to the Complaint as Exhibit 2.

> 35. A substantial portion of the indebtedness evidenced by the Promissory Note relates to amounts loaned by Dr. Rhodes and the Rhodes Family LP to Underhill to fund Underhill's share of principal reductions required by the lender on the Cape Coral Property.

36.     Pursuant to the Promissory Note, Underhill agreed to repay on demand the principal balance, plus interest at an initial rate of seven percent (7.00%) per annum compounded monthly on the unpaid principal balance.  Underhill also agreed to make monthly principal payments beginning on December 10, 2009, in the amount of $3,467.65.

37.     The Promissory Note provides that, upon any default and without notice, the interest rate could be increased by five percent (5.00%).  Additionally, any payment made ten (10) or more days after the due date could be assessed a late charge equal to five percent (5.00%) of the regularly scheduled payment.

38.     Underhill defaulted on the Promissory Note by, among other things, failing to pay in full the first monthly principal payment that was due on December 10, 2009.

39.     On June 12, 2015, the Rhodes Family LP formally demanded full payment of all outstanding amounts due under the Promissory Note.

40.     As of the date hereof, Underhill has failed and refused to pay the amounts due under the Promissory Note.

December 23, 2015, Rhodes' Counterclaims, Answer and Defenses at 9-10.  Thus, they sought damages and attorneys' fees per the terms of the 2009 Promissory Note.

Rhodes and Fincastle eventually filed a motion for summary judgment.  They argued that the September 25, 2007, Commission Agreement was unenforceable primarily under the doctrine of illegality due to the fee splitting

agreement between Underhill and Ruch; thus, Underwood Associates was not entitled to any commissions thereunder. Rhodes and Fincastle pointed out that a Draft Commission Agreement, dated May 25, 2007, was considered by Rhodes, Fincastle, Ruch, and Underhill. Under this May 25, 2007, Draft Commission Agreement, Rhodes and Fincastle would agree to pay a 3 percent commission upon the sale of individual lots to Ruch and Underhill. According to Rhodes and Fincastle, the May 25, 2007, Draft Commission Agreement was not executed by the parties but "reflect[s] the basic agreement of the parties." Motion for summary judgment at 3. Rhodes and Fincastle argued that under this agreement, Ruch would receive a commission for the sale of the Glenview Property. However, Rhodes and Fincastle refused to sign the agreement because Ruch was legally barred from receiving a commission as he was not licensed to sell real estate in Kentucky. For this reason, Rhodes and Fincastle maintained that the September 25, 2007, Commission Agreement was also an illegal contract because it would result in payment of a commission to an unlicensed individual (Ruch), by way of the fee splitting agreement entered into on September 27, 2007, between Ruch and Underhill.

By Memorandum and Order entered September 18, 2018, the circuit court denied Rhodes and Fincastle's motion for summary judgment. In so doing, the court reasoned:

[T]he record is undisputed that Plaintiffs and Defendants began negotiating a contract in May 2007 and drafted the May Draft Commission Agreement during those negotiations. However, that contract was not finalized or fully executed. Rather, Defendants and Underhill Associates entered into the Glenview Commission Agreement on September 25, 2007, wherein Defendants agreed to pay Underhill Associates a commission of 2.9% upon the sale of individual lots in the Glenview Property. The Glenview Commission Agreement is a clear, unambiguous and duly executed writing. Todd Underhill signed the Glenview Commission Agreement in his capacity as manager of Underhill Associates; Dr. Rhodes signed it in his individual capacity; and Canfield signed it in his capacity as a member of Fincastle. There is a presumption that the prior negotiations with respect to commission fee splitting prior to the execution of the Glenview Commission Agreement were abandoned in the final written agreement.

Todd Underhill and Mr. Ruch entered into the Fee Splitting Agreement on September [27], 2007. The Fee Splitting Agreement is also a clear, unambiguous and duly executed writing. Neither Underhill Associates, Dr. Rhodes nor Fincastle were parties to the Fee Splitting Agreement. The document is signed only by Todd Underhill and Mr. Ruch. The Glenview Commission Agreement is not expressly referred to in the Fee Splitting Agreement, but is only referred to, pertinently, as a "separate agreement to receive all commissions receivable under sale . . . ."

The Fee Splitting Agreement is separate and apart from the Glenview Commission Agreement. It involved different parties and the Fee Splitting Agreement expressly referred to the Glenview Commission Agreement as a separate agreement. Likewise, there is no reference to the Fee Splitting Agreement or commissions to Mr. Ruch in the Glenview Commission Agreement. Any illegality or unenforceability of the Fee

-10-

Splitting Agreement due to the fact that Mr. Ruch was not a licensed real estate broker when it was executed has no effect upon the enforcement of the Glenview Commission Agreement as it pertains to Individual Lot Commissions owed to Underhill Associates for the Individual Lot Sales. Thus, Defendants cannot utilize any illegality or unenforceability of the Fee Splitting Agreement to invalidate the Glenview Commission Agreement as a matter of law.

Memorandum and Order at 8-10 (footnotes omitted).

Ultimately, on September 1-2, 2020, the case was tried by the circuit court without a jury pursuant to Kentucky Rules of Civil Procedure (CR) 52.01. The circuit court rendered Findings of Fact, Conclusions of Law, and Judgment on January 20, 2021. Relevant to this appeal, the circuit court again determined that the September 27, 2007, Fee Splitting Agreement was enforceable and not an illegal contract:

The evidence in the record reflects that the May Draft Commission Agreement was not finalized and was negotiated prior to the parties' entering into the Glenview Commission Agreement. Thus, the May Draft Commission Agreement does not constitute an integrated contract. Nor are all the terms of the May Draft Commission Agreement comprised in the Glenview Commission Agreement. There is a presumption that the Glenview Commission Agreement is final and complete and that all prior negotiations between the parties have either been abandoned or incorporated into the final written instrument. [*New Life Cleaners v. Tuttle*, 292 S.W.3d 318 (Ky. App. 2009)], supra; [*Childers v. Lucas*, 192 S.W.2d 714 (Ky. 1946)], supra. The May Draft Commission Agreement, the Fee Splitting Agreement and the Glenview Commission Agreement are not part of

the same transaction, as they were not negotiated contemporaneously and involve different parties[.] Likewise, the May Draft Commission Agreement and the Fee Splitting Agreement do not constitute extrinsic evidence of any illegality or similar defense that is asserted against the formation of the Glenview Commission Agreement.

The fact that the Fee Splitting Agreement between Mr. Underhill and Mr. Ruch was entered into two days after the Glenview Commission Agreement does not create a latent ambiguity in the Glenview Commission Agreement. As noted earlier, the Glenview Commission Agreement, entered into between Dr. Rhodes and Fincastle, and Underhill Associates, contains no reference to the Fee Splitting Agreement.

The Fee Splitting Agreement is separate and apart from the Glenview Commission Agreement. It involved different parties and the Fee Splitting Agreement expressly referred to the [agreement to receive all commissions receivable under sale] as a "separate agreement." Likewise, there is no reference to the Fee Splitting Agreement or commissions to Mr. Ruch in the Glenview Commission Agreement. Any illegality or unenforceability of the Fee Splitting Agreement because Mr. Ruch was not a licensed real estate broker when it was executed has no effect upon the enforceability of the Glenview Commission Agreement as it pertains to Individual Lot Commissions owed to Underhill Associates for the individual Lot Sales.

. . . .

However, the Rhodes Parties have no standing to challenge the validity of the Fee Splitting Agreement and, since any reference to any agreement to split fees in the May Draft Commission Agreement was abandoned in the final executed a [sic] draft of the Glenview Commission Agreement, any illegality of the Fee

-12-

> Splitting Agreement will not invalidate the Glenview Commission Agreement as a matter of law.

January 20, 2021, Findings of Fact, Conclusions of Law, and Judgment at 42-44 (footnotes omitted).

The circuit court also found that Underhill Associates timely disclosed to Rhodes and Fincastle that it was acting as a dual broker for both the sellers (the Borders) and for Rhodes and Fincastle as the buyer of the Glenview Property. As a result, the circuit court found that Rhodes and Fincastle breached the September 25, 2007, Commission Agreement by their failure to pay Underhill Associates 2.9 percent commission upon the sale of individual lots to third parties. The circuit court determined that $261,646.67 in commissions were due to Underhill Associates under the September 25, 2007, Commission Agreement. The circuit court also found that Underhill owed a total of $520,046.31 under the terms of the 2009 Promissory Note to the Rhodes Partnership. The court offset the $261,646.67 in commissions against the total indebtedness ($520,046.31) owed under the 2009 Promissory Note and rendered a judgment for $258,399.64 in favor of Rhodes, Fincastle, and Rhodes Partnership. Lastly, the circuit court determined that the Rhodes Partnership would be entitled to an award of reasonable attorneys' fees per the terms of the 2009 Promissory Note. The circuit court instructed counsel for Rhodes Partnership to file a motion and affidavits establishing the amount of attorneys' fees.

-13-

All parties filed motions to alter, amend, or vacate the January 20, 2021, Judgment. In a February 12, 2021, order, the circuit court granted the motion to vacate filed by Underhill Associates but denied the motion filed by Rhodes, Fincastle, and Rhodes Partnership. The court recognized that the amount of awarded commissions to Underhill Associates was in error and did not reflect the parties' trial stipulations. The court, therefore, determined that the commissions due to Underhill Associates totaled $350,731.71, including interest. The court then offset the $350,731.71 owed for commissions against the $520,046.31 due under the 2009 Promissory Note and awarded a total judgment of $169,314.60 to Rhodes, Fincastle, and Rhodes Partnership.

Thereafter, Rhodes, Fincastle, and Rhodes Partnership filed a motion for attorneys' fees and sought $371,571.06 in attorneys' fees and $10,276.30 in costs.

On September 17, 2021, the court rendered an order denying the motion for attorneys' fees. The court noted that this case involved multiple claims and counterclaims. The court stressed that only those reasonable attorneys' fees incurred as a result of Underhill's failure to pay or his breach of the 2009 Promissory Note were recoverable. The court concluded that the invoices of the attorneys failed to adequately differentiate between time spent on claims related to the 2009 Promissory Note and time spent on other claims, which were not

recoverable. Thus, the court instructed that "counsel must provide a clarification to the court by annotating and providing a summary of the invoices to the court to clarify the attorneys' fees owed for specific work executed to collect under the Note, the hours worked to litigate the Note, and the applicable rate of attorneys' fees that are attributable to the Note." September 17, 2021, Order at 18.

Subsequently, on October 26, 2021, Rhodes, Fincastle, and Rhodes Partnership filed a renewed motion for attorneys' fees. In the motion, the parties attached annotated invoices and affidavit of counsel "consistent with the [September 17, 2021] Order." Renewed Motion for Attorneys' Fees at 3. They sought a total of $320,143.34 in attorneys' fees and $10,526.07 in costs.

In a February 25, 2022, order, the circuit court granted in part and denied in part the renewed motion for attorneys' fees. The court determined that $30,004.00 of the total attorneys' fees sought ($320,143.34) was not related to work on the 2009 Promissory Note and were not recoverable. The court, thus, awarded Rhodes, Fincastle, and Rhodes Partnership $290,139.34 in attorneys' fees and $10,526.07 in costs. The court also entered a monetary judgment for $169,314.60 against Underhill for breach of the 2009 Promissory Note. These appeals follow.

Rhodes, Fincastle, and Rhodes Partnership (collectively referred to as appellants) bring Appeal No. 2022-CA-0340-MR, and Underhill and Underhill

Associates (collectively referred to as Underhill) bring Cross-Appeal No. 2022-CA-0342-MR. We shall initially address Appeal No. 2022-CA-0340-MR and then address Cross-Appeal No. 2022-CA-0342-MR.

We begin our analysis by noting that findings of fact made by a circuit court in a bench trial shall not be set aside unless clearly erroneous. CR 52.01. Findings of fact are clearly erroneous if not supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is evidence that "has sufficient probative value to induce conviction in the mind of a reasonable person." *Bishop v. Brock*, 610 S.W.3d 347, 350 (Ky. App. 2020). It is within the sole province of the circuit court to observe and assess the credibility of witnesses' testimony. *Id.* Our review proceeds accordingly.

<u>Appeal No. 2022-CA-0340-MR</u>

Appellants initially contend that the circuit court erred in concluding that the September 25, 2007, Commission Agreement was a legal and enforceable contract. Appellants argue that the circuit court failed to incorporate the terms of the May 25, 2007, Draft Commission Agreement, the September 25, 2007, Commission Agreement, and the September 27, 2007, Fee Splitting Agreement together. When incorporated, appellants maintain that these three documents form a single-unified contract. Appellants point out the provision in the September 27, 2007, Fee Splitting Agreement to pay Ruch a commission from the sale of the

Glenview Property is violative of Kentucky law and renders the unified contract illegal. Therefore, appellants maintain that since the September 25, 2007, Commission Agreement is illegal, they owe no commission to Underhill under that agreement.

In Kentucky, it is well-settled that only a licensed real estate broker or real estate agent may receive a commission on the sale of real property. *Kirkpatrick v. Lawrence*, 908 S.W.2d 125, 128 (Ky. App. 1995); Kentucky Revised Statutes (KRS) 324.020. In fact, Kentucky has adopted a "rigid rule" precluding enforcement of an agreement to pay a commission upon the sale of real property to an unlicensed individual. *Kirkpatrick*, 908 S.W.2d at 129.

It is uncontroverted that Ruch was not licensed to sell real property in Kentucky. Nevertheless, in the September 27, 2007, Fee Splitting Agreement, Underhill agreed to pay Ruch 75 percent of the commissions he received from the sale of the Glenview Property. However, neither Underhill nor Ruch is seeking enforcement of the September 27, 2007, Fee Splitting Agreement in this appeal. Rather, the underlying action was initiated by Underhill seeking to enforce the September 25, 2007, Commission Agreement. Therein, Rhodes and Fincastle agreed to pay Underhill a 2.9 percent commission for the sale of the Glenview Property. Ruch was not a party to the September 25, 2007, Commission Agreement. Standing alone, the September 25, 2007, Commission Agreement is

an enforceable contract as Underhill is a licensed real-estate broker. But, appellants argue that the terms of the September 25, 2007, Commission Agreement, the September 27, 2007, Fee Splitting Agreement, and the May 25, 2007, Draft Commission Agreement should be merged into a single-unified contract, which they argue is unenforceable under the doctrine of illegality.

Under certain circumstances, a written agreement or writing may be incorporated by reference into another written agreement or writing. To be so incorporated, a written agreement or writing must expressly refer to the separate written agreement or writing, and the parties must have clearly assented to and intended the separate writings to be incorporated. *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332, 344 (Ky. 2015).[1] The intention of the parties is key to determining whether separate documents are incorporated and merged into one unified contract. *Id.* at 346.

As hereinbefore stated, it is undisputed that Rhodes, Fincastle, Underhill, and Ruch initially considered entering into the May 25, 2007, Draft Commission Agreement. Under its terms, Rhodes and Fincastle would have

---

[1] This Court notes that the Kentucky Supreme Court rendered *University of Kentucky v. Regard*, 670 S.W.3d 903 (2003) on June 15, 2023. Although it dealt with incorporation by reference as to contracts, *Regard*, 670 S.W.3d 903 was a plurality opinion as a majority of the Supreme Court could not agree upon the legal reasoning to support its decision. In such circumstances, the Supreme Court has instructed that such opinion "has no *stare decisis* effect." *J.A.S. v. Bushelman*, 342 S.W.3d 850, 853 (Ky. 2011) (quoting *Ware v. Commonwealth*, 47 S.W.3d 333, 335 (Ky. 2001)); *see also Hudson v. Commonwealth*, 202 S.W.3d 17, 21-22 (Ky. 2006). As a result, we do not rely upon *Regard*, 670 S.W.3d 903.

agreed to pay a 3 percent commission, with Ruch receiving 75 percent and Underhill receiving 25 percent of same. Nonetheless, the parties did not execute the May 25, 2007, Draft Commission Agreement. Apparently, Stephen Canfield informed Underhill that paying Ruch a commission, who was not licensed to sell real property in Kentucky, violated Kentucky law;[2] thus, the May 25, 2007, Draft Commission Agreement was not executed because of its purported illegality.

Thereafter, the September 25, 2007, Commission Agreement was executed, whereby Rhodes and Fincastle agreed to pay Underhill a 2.9 percent commission. Ruch was not a party to the September 25, 2007, Commission Agreement. Two days later, Underhill and Ruch entered into the September 27, 2007, Fee Splitting Agreement. The agreement stated:

> Broker [Underhill], has agreed under separate agreement to receive all commissions receivable under the sale of approximately 34 acres known as the **HARTHILL FARM [GLENVIEW PROPERTY]**. **RUCH** shall receive 90% of the fee payable by Sellers. Additionally, **RUCH** shall receive 75% of the fee payable by virtue of the individual lot sale by Developer, **FINCASTLE/HARTHILL**.

September 27, 2007, Fee Splitting Agreement at 1.

In the September 27, 2007, Fee Splitting Agreement, there is language referencing the earlier agreement that paid Underhill a commission for the sale of

---

[2] Fincastle Group, LLC, was a limited liability company whose members included Dr. John D. Rhodes, III, and Stephen Canfield.

the Glenview Property, although neither the identity of the parties nor date of the earlier agreement are specifically stated therein. However, there is no reference in the September 25, 2007, Commission Agreement to some future agreement like that entered into between Underhill and Ruch. And, there is absolutely no evidence in the record that Underhill and Ruch intended to incorporate the terms of the September 25, 2007, Commission Agreement into their fee splitting agreement. We totally agree with the circuit court's conclusion that the two agreements were separate and did not involve the same parties. The legality of Underhill and Ruch's fee splitting agreement has no bearing on the enforcement of the September 25, 2007, Commission Agreement.

Additionally, the facts and context surrounding the May 25, 2007, Draft Commission Agreement, the September 25, 2007, Commission Agreement, and the September 27, 2007, Fee Splitting Agreement do not support incorporation of these documents into a unified contract. The May 25, 2007, Draft Commission Agreement was not executed by the parties because of the purported illegality of paying Ruch a commission. In the September 25, 2007, Commission Agreement, the parties agreed to pay Underhill a 2.9 percent commission. It is patently clear that the parties to the September 25, 2007, Commission Agreement intentionally did not provide for the payment of a commission to Ruch. In fact, appellants admit that the September 25, 2007, Commission Agreement and the September 27, 2007,

-20-

Fee Splitting Agreement were intended to be separate agreements due to the illegality of paying Ruch a commission. It is incongruous for appellants to now argue that the September 25, 2007, Commission Agreement and the September 27, 2007, Fee Splitting Agreement were intended to be incorporated and merged into a unified contract, especially given appellants were not a party to the September 27, 2007, Fee Splitting Agreement. Indeed, the context and particular facts surrounding the execution of the September 27, 2007, Fee Splitting Agreement reveals a contrary intention. Thus, we agree with the circuit court that there was no unified agreement entered into by the parties to this appeal.

Appellants next argue that the September 25, 2007, Commission Agreement is illegal and unenforceable because Underhill failed to timely disclose that he served as dual broker for the Bordens (sellers) and for appellants (buyers) as to the sale of the Glenview Property. Appellants maintain that Underhill had a duty to timely disclose such dual representation but failed to do so.

In its Findings of Fact, Conclusions of Law, and Judgment, the circuit court found that appellants were aware of Underhill's dual representation:

> The evidence at trial showed that the commission was disclosed in two places on the Closing Statement for the sale of the property to Fincastle. . . . Canfield also testified that he had no recollection that Underhill Associates disclosed its dual role in any way prior to the commission agreement being executed in September 2007; however, he recalls that it was disclosed months later at the closing in January 2008. (*Id.* at pp. 40-41).

-21-

At trial, Dr. Rhodes acknowledged that the Closing Statement shows the seller commission of $156,000 to Underhill Associates in two places – under Seller's Expenses and under Disbursements. (Dr. Rhodes Trial Testimony, 09/01/2020, 05:03:25-05:04:10 PM). See, Underhill Exhibit 76, Glenview Closing Statement. Dr. Rhodes acknowledged that, although the commission to Underhill Associates is disclosed on the Glenview Closing Statement, the problem he had about the commission was that he did not know about it or was not aware of it prior to 2014 when he was shown the Glenview Closing Statement by Mark Page. (*Id.*, 09/01/2020, 05:06:30-05:07:42 PM). Mr. Underhill testified that everyone had full adequate disclosure of the commission to Underhill Associates on the Glenview sales through the Glenview Closing Statement in two places, which was also in front of all parties to the transaction. (Underhill Trial Testimony, 09/02/2020, 02:11:20-02:11:47 PM; 04:35:11-04:35:19 PM). During his deposition, Canfield testified that he was sure he knew about the commission from the Bordens by the time of the closing. (Canfield Dep. at p. 41). Dr. Rhodes admitted that Canfield was the managing member of their real estate venture, Fincastle. (Dr. Rhodes Trial Testimony, 09/01/2020, 10:49:47-10:50:54 AM). Since Canfield was on notice, Fincastle was also on notice. Any failure of Dr. Rhodes to pay attention or attend the closing does not change the fact that the commission was fully disclosed to all parties through the Closing Statement. . . .

Findings of Fact, Conclusions of Law, and Judgment at 45-46. The circuit court found that Underhill's dual representation was disclosed to appellants in the closing statement for the sale of the property to Fincastle, and this finding is supported by substantial evidence. Appellants claim that such disclosure was

untimely as appellants believe that disclosure must have been made before execution of the September 25, 2007, Commission Agreement. We disagree.

Kentucky law only requires the seller and buyer be aware of the dual representation by the real estate broker. *Curtis v. Spadie*, 399 S.W.2d 731, 733 (Ky. 1966); *Stuart McKnight & Co. v. Monroe*, 1 S.W.2d 1054, 1055 (Ky. 1928). Here, the closing statement disclosed Underhill's dual representation in two separate places. We find no error in the circuit court's analysis and finding that Underhill's dual representation was disclosed in the closing statement, and thus reject appellants' argument that the September 25, 2007, Commission Agreement was illegal and unenforceable based on the purported nondisclosure.

In summation, we agree with the circuit court that the two agreements entered into by the parties were not a single unified incorporated agreement, but rather two separate, stand alone enforceable agreements that were not barred by the doctrine of illegality.

We view any remaining contentions of error in the direct appeal as moot or without merit.

## CROSS-APPEAL NO. 2022-CA-0342-MR

Appellees contend that the circuit court's award of $290,139.34 in attorneys' fees was improper. Appellees argue that the awarded attorneys' fees were excessive and unreasonable. In support thereof, appellees maintain that

appellants originally asserted that Underhill owed $956,633.78 upon the promissory note, but the circuit court only awarded $169,314.60.  Appellees argue that the attorneys' fees should have been discounted based upon appellants lack of success or only partial success upon their claim of breach of the promissory note. Moreover, appellees assert that legal counsels' hourly rate was excessive and unreasonable.  Appellees point out that one of appellants' counsel, Jay Geller, charged $525 per hour in November 2020.

It is well-established that attorney fees may be awarded when a specific contractual provision provides for same.[3] *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 787 (Ky. 2017).  Generally, an award of attorneys' fees must be reasonable, and the determination of reasonableness is within the sound discretion of the circuit court.  *Dawahare v. Cabinet for Health*

---

[3] It is undisputed that the 2009 Promissory Note provided for an award of attorneys' fees.  It read, in relevant part:

> ATTORNEYS' FEES; EXPENSES.  Lender may hire or pay someone else to help collect the loan if I do not pay.  I will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  If not prohibited by applicable law, I also will pay any court costs, in addition to all other sums provided by law.

2009 Promissory Note at 2.

*and Family Servs.*, 662 S.W.3d 745, 747 (Ky. 2023). When considering whether a fee is reasonable, the circuit court should rely upon "its own expertise" and the following factors:

> (a) Amount and character of services rendered.
>
> (b) Labor, time, and trouble involved.
>
> (c) Nature and importance of the litigation or business in which the services were rendered.
>
> (d) Responsibility imposed.
>
> (e) The amount of money or the value of property affected by the controversy, or involved in the employment.
>
> (f) Skill and experience called for in the performance of the services.
>
> (g) The professional character and standing of the attorneys.
>
> (h) The result secured.

*Mo-Jack Distrib., LLC v. Tamarack Snacks, LLC*, 476 S.W.3d 900, 910 (Ky. App. 2015) (quoting *Axton v. Vance*, 269 S.W. 534, 536-37 (Ky. 1925)).

In its September 17, 2021, Memorandum and Order, the circuit court found that the hourly rate of appellants' counsel was reasonable:

> The Rhodes Parties [appellants] presented evidence of comparable attorneys' fees in the Louisville, Kentucky[,] area to show that their attorneys' fees are reasonable. The Court finds that the rates charged by the Rhodes Parties' counsel - $575 per hour for Mr. Geller

and $340 per hour for Mr. Fischer – are reasonable, given the expertise of the lawyers involved, the allocation of basic research and writing to attorneys who commanded a lower hourly rate, and the reputation and experience of counsel, especially in light of the evidence of the hourly wages of other attorneys in the Louisville, Kentucky[,] area with similar skill and experience for efforts taken in comparative actions. Thus, the Court finds that the hourly rates of Mr. Geller and Mr. Fischer are reasonable and allowable under applicable law. . . .

September 17, 2021, Memorandum and Order at 10-11 (footnote omitted).

Based on the court's analysis, it is clear that the circuit court considered the hourly rate of other attorneys in the Louisville, Kentucky, area, the expertise of appellants' counsel, the reputation of appellants' counsel, and the experience of appellants' counsel. The court also noted that appellants' counsel allocated more basic tasks to attorneys who charged a lower hourly rate. Upon the whole, we are unable to conclude that the circuit court abused its discretion by finding the hourly rate charged by appellants' attorneys to be reasonable.

As to appellees' argument that the award of attorneys' fees should be reduced based upon appellants lack of success, we again conclude that the circuit court did not abuse its discretion. Appellees maintain that appellants were only awarded $169,314.60 in damages for breach of the terms of the 2009 Promissory Note; however, such is not entirely accurate. In fact, the circuit court awarded appellants $520,046.31 in principal and interest under the 2009 Promissory Note. The court then offset the amount of real estate commission ($350,737.71) awarded

-26-

to appellees against the $520,046.31 for a total award of $169,314.60 in damages. Under these facts, we do not believe the circuit court abused its discretion by failing to reduce the awarded attorneys' fees because of appellants' lack of success on their promissory note claim.

For the foregoing reasons, we affirm Appeal No. Appeal No. 2022-CA-0340-MR and Cross-Appeal No. 2022-CA-0342-MR.

ALL CONCUR.

BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

James W. Proud
John David Dyche
Louisville, Kentucky

Jeremy R. Fischer, *pro hac vice*
Portland, Maine

Jay S. Geller, *pro hac vice*
Falmouth, Maine

BRIEF FOR APPELLEES/CROSS-
APPELLANTS:

David S. Kaplan
Louisville, Kentucky

Christopher B. Rambicure
Louisville, Kentucky